**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

JEROME WOLFE                                          CIVIL ACTION

VERSUS                                                NO. 09-3366

BURL CAIN, WARDEN                                     SECTION "I" (6)

### REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing. For the reasons set forth below, it is recommended that the instant petition be **DISMISSED WITH PREJUDICE.**

### PROCEDURAL HISTORY

Petitioner, Jerome Wolfe, presently incarcerated in Dixon Correctional Center

located in Jackson, Louisiana,[1] was charged by grand jury indictment with second degree murder. Petitioner was tried by jury in the Thirty-Second Judicial District Court for the Parish of Terrebonne and, on March 7, 2002, was found guilty of the lesser offense of manslaughter.[2] The trial court sentenced petitioner to 40 years incarceration at hard labor. On June 25, 2004, the Louisiana First Circuit Court of Appeal affirmed petitioner's conviction and sentence. *State v. Wolfe*, 876 So.2d 966 (Table), No. 2003-KA-0409 (La. App. 1 Cir. 2004) (unpublished opinion).[3] On March 11, 2005, the Louisiana Supreme Court denied petitioner's writ application, *State v. Wolfe*, 896 So.2d 60 (La. 2005), thereby rendering petitioner's conviction and sentence final.

On February 17, 2006, petitioner sought post-conviction relief from the state district court.[4] Petitioner's efforts in this regard culminated on December 19, 2008, when the Louisiana Supreme Court denied his writ application. *State ex rel. Wolfe v. State*, 996 So.2d 1128 (La. 2008).

---

[1] When petitioner filed the instant action, he was incarcerated in the Louisiana State Penitentiary located in Angola, Louisiana.

[2] State rec., vol. 2 of 5, p. 748.

[3] State rec., vol. 4 of 5, pp. 1012-1027.

[4] In its original response (rec. doc. 15), the State asserted that petitioner did not seek post-conviction relief until March 5, 2007, and, as such, contended the instant matter was untimely. This court, however, based upon the reasoning set forth in its August 30, 2010 Report and Recommendation (rec. doc. 19), determined February 17, 2006, to be the appropriate filing date of petitioner's state post-conviction application and, as such, determined the instant action was timely.

Petitioner filed the instant action for federal habeas corpus relief on April 9, 2009, raising the following claims for relief:  1) The trial court erred in allowing into evidence a witness's prior statement that was used to impeach her trial testimony; and, 2) he received ineffective assistance of counsel.[5]  This court shall address the merits of the above claims following its consideration of petitioner's motion to stay (rec. doc. 22), along with its review of the pertinent facts and standard of review.

**MOTION TO STAY**

On October 14, 2010, petitioner filed with this court a motion requesting that his federal habeas petition be stayed and held in abeyance while he exhausts additional claims in the Louisiana state courts.  Petitioner seeks to stay the instant matter so that he may, if unsuccessful in obtaining relief in the state courts, add said claims to the above-captioned habeas action.  Petitioner, however, fails to set forth the additional claims he wishes to assert in support of habeas relief.  He merely states that the additional issues pertain to his "innocence", the prosecution's "misrepresentation of evidence", and "favorable evidence ... suppresed [sic] during the proceedings." (Rec. doc. 22, p. 2).  According to petitioner, he "recently obtained the case file of his trial attorney" and it was not until his review of this file that he discovered these additional issues. (Rec. doc. 22, p. 2).

---

[5]The State does not contest the fact that petitioner has exhausted his state court remedies with respect to these claims as required under *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

In the context of "mixed" petitions, the Supreme Court, in *Rhines v. Weber*, 544 U.S. 269, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005), has addressed a district court's authority to grant stays in habeas cases pending exhaustion of state court remedies.[6] In *Rhines*, the Court determined that due to the fact that "granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts . . ." a stay and abeyance is appropriate only in limited circumstances. *Rhines*, 544 U.S. at 277, 125 S.Ct. at 1535. A habeas petition should be stayed and held in abeyance only if there is "good cause for the petitioner's failure to exhaust his claims . . . ." *Id*. Further, even if there is "good cause" for a petitioner's failure to exhaust, a stay and abeyance should be granted only when the unexhausted claims are not "plainly meritless." *Id*.

Petitioner alleges that he did not learn of the new claims he desires to file until he reviewed his trial attorney's "case file". Petitioner asserts that he did not attain a copy of the pertinent "case file" until "recently". However, petitioner's trial ended on March 7, 2002. Petitioner provides no explanation as to why it took him approximately eight years to attain his trial attorney's "case file". Further, petitioner provides no factual or legal support for his newly discovered, unspecified claims. As such, this court is unable to make the preliminary

---

[6]The undersigned acknowledges that because petitioner's unexhausted claims are not presently before the court, the instant petition is not technically a "mixed" petition. However other courts have applied the *Rhines* criteria under similar circumstances. *See Phillips v. Cain*, 2009 WL 580233 (W.D. La. Mar. 5, 2009); *Thomas v. Cain*, 2006 WL 418628 (W.D. La. Jan. 27, 2006); *Moore v. Cain*, No. 10-0676 (E.D. La. Aug. 25, 2010) (unpublished opinion). Given the absence of contrary authority, the undersigned finds *Rhines* applicable in the instant matter.

determination, required by *Rhines*, as to whether or not there is good cause for petitioner's failure to exhaust his state court remedies and whether or not his claims are "plainly meritless". *See Phillips v. Cain*, 2009 WL 580233, *1 (W.D. La. Mar. 5, 2009) (in absence of factual or legal support for petitioner's newly discovered unidentified claims, court unable to make preliminary determinations required under *Rhines*). Accordingly, the undersigned recommends that petitioner's motion to stay and hold the above-captioned action in abeyance be **DENIED**.

**FACTS**[7]

In the late evening of March 17, 2001, Patrolman Robert Lottinger was dispatched by the Houma Police Department to investigate a report of a shooting at 1713 Boston Lane. He arrived at approximately 10:30 p.m. and immediately encountered Claudia Wolfe in her front yard. Ms. Wolfe hysterically repeated, over and over, that her son had just shot her boyfriend and had fled the scene. She told the officer that her son's name was Jerome Wolfe and that the victim, Norman Frank, was in the back bedroom of her home. Ms. Wolfe, Jerome Wolfe, and Norman Frank all lived together. Patrolman Lottinger found the victim lying in bed, bleeding profusely from what appeared to be a gunshot wound to the head. An ambulance was called to the scene. The victim died shortly thereafter at a local hospital.

---

[7]The facts are taken from the Louisiana First Circuit Court of Appeal's opinion, *State v. Wolfe*, 876 So.2d 966 (Table), No. 2003-KA-0409 (La. App. 1 Cir. 2004) (unpublished opinion).

Detectives soon arrived to investigate the shooting. Detective Jude McElroy interviewed Ms. Wolfe, who again reported that her son shot the victim. She was taken to the police station, where Detective McElroy took a detailed statement, which was contemporaneously typed. Ms. Wolfe signed the statement after reviewing it, certifying that the facts contained therein were true and correct.

Ms. Wolfe's typed statement was read to the jurors. In that statement, she said that she was at home washing dishes the night of the shooting, and the victim had been in bed sleeping for a while. Her son knocked and entered, wearing a yellow raincoat and wheeling in a red bicycle. She recognized the raincoat and bike as belonging to her brother, Clifford Green, who lived nearby. She had taken her son to Green's home earlier in the day to wash clothes. As petitioner walked down the hall toward her bedroom, he asked where Frank was. She advised that he was asleep. She followed petitioner and saw that he had two guns. When they entered the bedroom, Frank was lying on his stomach asleep. She witnessed petitioner lean over Frank's head and shoot him at close range. He then moved the victim's hair and looked at the entry wound. She told petitioner that he was going to be in trouble. He replied: "You ain't gonna tell." Petitioner then went around to the other side of the bed and shot the victim in the face with the same weapon. Ms. Wolfe ran out of the house and found her neighbor, Linda Smith, who was sitting in her vehicle outside listening to the radio. She asked her to call for help. When Ms. Wolfe tried to get back into her home, the door had been locked. She got inside through a window and went to the victim's side, waiting there

6

for the police to arrive.

After signing her typed statement, Ms. Wolfe also agreed to give a videotaped statement. The videotaped statement, made at 12:30 a.m., about two hours after the shooting, conveyed substantially the same information. It also was introduced into evidence and played for the jurors. Detective McElroy testified that Ms. Wolfe was very excited when she gave her statements, but she did not seem intoxicated or high on anything. The detective, who had training in the field detection of insobriety, spent a good deal of time with Ms. Wolfe during the taking of her statements and at the hospital afterward. He detected no behavior indicating that she was under the influence of alcohol. In her videotaped statement, Ms. Wolfe explained that petitioner had a problem with Frank from the time she and Frank began a relationship in 1996. He apparently was jealous and felt that his mother loved Frank more than she loved him. She insisted that Frank was very peaceful and religious and that he and petitioner had not quarreled that day. At the time of the shooting, petitioner did not say or do anything to indicate why he shot Frank. Ms. Wolfe characterized her son as lazy, cruel, evil, and controlling. He did not like to take correction from his mother. She begged the police to find him because she was afraid to go home while he was at large.

Notwithstanding her detailed statement on the evening of the crime, at trial, Ms. Wolfe denied having any recollection whatsoever of the events surrounding the shooting. Although she agreed that she had signed the statement she gave to the police, and agreed that she was the person depicted on the videotape, she claimed that she could not remember

7

anything she told the officers on the night of the incident, insisting that she was full of alcohol and on drugs at the time. She also denied a recollection of asking Smith to call 911. She denied even knowing at the time that her boyfriend had been shot.

      Although Ms. Wolfe denied recollection of the events surrounding the shooting, the testimony of other witnesses corroborated many of the details she revealed in her statements given on the night of the homicide. Smith testified that she was sitting outside her residence on the night of the incident, listening to the radio in her car with her fiancé. She saw the petitioner, who was known to her, arrive on a red bicycle at about 10:15 p.m., clad in a yellow raincoat. He knocked on the door of his mother's home and went inside with the bike. About ten minutes later she saw him leave on foot, without the raincoat. Soon thereafter, Ms. Wolfe ran out of her home and knocked on the window of Smith's vehicle, screaming for Smith to call 911. She called the police and waited outside. When they arrived, Smith reported what she had witnessed and what Ms. Wolfe had said that evening. The transcript of the 911 call made that night was introduced into evidence as well as the original audiotape. The message conveyed to the emergency operator was that a lady's son had shot her boyfriend.

      As a result of their investigation that evening, officers went to the Daspit Street residence of Green, petitioner's uncle, where they believed petitioner might be hiding. Lakeisha Sneeze, who lived with Green, testified that petitioner was at their home earlier that evening to wash clothes. She asked petitioner to go home around 9:30 p.m. because she had

to go to work the next day. She and Green offered him a red bike and yellow raincoat because of the inclement weather. Petitioner returned to their home later that night, saying that "he got mad." He was acting upset and nervous and would peer out of the window whenever a vehicle drove by. After she and Green retired that night, petitioner came to their bedroom and reported that someone was knocking on the door. He told them to say that he was not there. The door was answered, and the police were admitted to the house. Sneeze went back to the bedroom, where petitioner was hiding, to get her children, who were also in the room. Petitioner told her to tell the police that he had a gun. She actually saw him with a gun in his hand. Sneeze testified that neither she nor Green kept any weapons in their home.

After all of the occupants other than petitioner were evacuated, a brief negotiation between petitioner and the officers took place. Shortly thereafter, the nineteen-year-old petitioner surrendered. After being *Mirandized*, petitioner told the officers that the gun was in the bedroom. Detective John Chapman then recovered a .32 caliber weapon from atop a television in the bedroom where petitioner had been hiding. The weapon was loaded with four live rounds and two spent shell casings. It was later determined by forensics investigation and ballistics testing that the two bullets fired into the skull of the victim came from petitioner's gun. An autopsy revealed that the cause of Frank's death was being shot in the head twice with bullets from petitioner's weapon.

Petitioner was taken to the police station after he surrendered. He was

*Mirandized* again and executed a waiver of rights form. Petitioner gave a videotaped statement, which was introduced into evidence. On the tape he said he had a feeling that someone was dead. When asked if he wanted to talk about what happened, he replied that he "would not know where to start." Then he indicated that he did not want to talk further to the officers. Petitioner did not testify at trial.

**STANDARD OF REVIEW**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the

>  governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams[ v. Taylor*, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Hill*, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

## ANALYSIS

### Trial Court Erred in Allowing Statement into Evidence

Petitioner contends that the trial court erred in allowing into evidence his mother's statement provided to police shortly after the murder wherein she stated that her son had killed her boyfriend. This statement was in contrast to her trial testimony in which she stated that she could not remember what had occurred on the night at issue.

It is well established that federal habeas review is limited to questions of constitutional dimension. *See generally Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992), *cert. denied*, 508 U.S. 978, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993); *Castillo v.*

*Johnson*, 141 F.3d 218, 222 and 224 (5th Cir.), *cert. denied*, 524 U.S. 979, 119 S.Ct. 28, 141 L.Ed.2d 788 (1998). In reviewing a state court evidentiary determination, such as the admission of Ms. Wolfe's statement, the federal habeas court's role "'is limited to determining whether a trial judge's error is so extreme that it constituted denial of fundamental fairness.'" *Andrade v. McCotter* 805 F.2d 1190, 1193 (5th Cir. 1986), *quoting Mattheson v. King,* 751 F.2d 1432, 1445 (5th Cir.1985).

In the instant matter, it is clear that petitioner was not denied a fair trial by virtue of the trial court's decision to allow into evidence Ms. Wolfe's statement that her son murdered her boyfriend, a statement which contradicted her trial testimony to the effect that she could not recollect what happened on the night of the murder. Even without Ms. Wolfe's statement, the evidence of petitioner's guilt was overwhelming. Police officials found in petitioner's possession the gun which was used to murder the victim. Further, Ms. Wolfe's neighbor, Linda Smith, corroborated Wolfe's statement. Smith testified that Ms. Wolfe asked her to call 911 and in Smith's 911 call she informed that a lady's son had shot her boyfriend. Clearly, petitioner suffered no denial of due process by virtue of the trial court's evidentiary ruling.

**Ineffective Assistance of Counsel**

Petitioner argues that he received ineffective assistance of counsel when counsel failed to object to the prosecutor's improper remark to the effect that petitioner's mother had testified at trial that she could not recollect what had happened on the night of

the murder in an attempt to save her son. Petitioner also argues that counsel was ineffective due to his failure to object to evidence which was admitted without proper validation. Specifically, petitioner complains that counsel should have objected to the admission of the bullets taken from the victim's body because the coroner did not identify the bullets as being those which he removed from the victim. Petitioner also complains about the fact that an expert was allowed to offer testimony regarding a ballistics test which linked the bullets to the gun found in petitioner's possession at the time of his arrest. According to petitioner, counsel erred in failing to challenge the "methodology for validation purpose[s]." (Rec. doc. 1, p. 7).

The seminal Supreme Court decision regarding ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984), wherein the Court held that in order to prove that counsel was unconstitutionally ineffective, petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.

Under the deficient performance prong of the *Strickland* test, "it is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed. 2d 180 (1993), *citing Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. To prove

prejudice under the *Strickland* standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

In the instant matter, petitioner has clearly failed to satisfy his burden of proof. First, the prosecutor, during closing remarks, is allowed to comment on the evidence and, as such, there was no basis for defense counsel to lodge an objection. Under federal law, as under state law, an attorney's performance is not rendered ineffective due to his failure to raise meritless objections or arguments. *See, e.g., United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument . . . cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."); *Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995) ("Counsel cannot be deficient for failing to press a frivolous point."). *United States v. Gibson*, 55 F.3d 173, 179 (5th Cir. 1995) ("Counsel is not required by the Sixth Amendment to file meritless motions.").

Petitioner's complaint that the prosecution failed to substantiate that the bullets tested by the ballistics expert came from the victim and, therefore, defense counsel should have raised an objection, is likewise without merit. The assistant coroner, Dr. Jay Brooks, testified that in connection with an autopsy that he performed on the victim, he removed two

bullet fragments and provided them to Detective John Chapman.[8] Detective Chapman, who attended the victim's autopsy, corroborated that he witnessed Dr. Brooks remove the bullet fragments from the victim, place the bullet fragments in vials, and then provide him with the vials. Chapman, in turn, provided the vials to the State Police Crime Lab for ballistics testing.[9] Accordingly, a proper chain of custody was established and, therefore, defense counsel had no basis to lodge an objection.

As for his complaint regarding the ballistics testing, an examination of the pertinent trial testimony reflects that Charles Watson, following a thorough examination of his credentials, was accepted by the court as a ballistics expert.[10] Thereafter, Mr. Watson proceeded to provide detailed testimony regarding the ballistics testing he performed. Again, petitioner provides no basis upon which defense counsel could have lodged an objection.

Accordingly;

## RECOMMENDATION

It is hereby **RECOMMENDED** that petitioner's motion to stay the instant action (rec. doc. 22) be **DENIED.**

It is further **RECOMMENDED** that petitioner's application for federal habeas

---

[8] State rec., vol. 2 of 5, p. 673.

[9] State rec., vol. 2 of 5, pp. 481-482.

[10] State rec., vol. 2 of 5, pp. 518-535.

corpus relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. §636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996)(*en banc*).[11]

New Orleans, Louisiana, this __18th__ day of ____November____, 2010.

*[signature]*
LOUIS MOORE, JR.
United States Magistrate Judge

---

[11]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.